Teresa BAKER, etc., Plaintiff, Appellee,

v.

CITY OF CONCORD, et al.,
Defendants, Appellants.

Nos. 90–1442, 90–1443.

United States Court of Appeals,
First Circuit.

Heard Aug. 1, 1990.

Decided Oct. 16, 1990.

John A. Lassey, with whom Wadleigh, Starr, Peters, Dunn & Chiesa, Manchester, N.H. and Susan S. Geiger, Asst. Atty. Gen., Concord, N.H., were on brief, for defendants, appellants.

H. Bernard Waugh, Jr., Hanover, N.H., on brief for New Hampshire Mun. Ass'n, amicus curiae.

Alan Linder, with whom New Hampshire Legal Assistance, Concord, N.H. and Chiara Dolcino, Center Barnstead, were on brief, for plaintiff, appellee.

Before CAMPBELL and SELYA, Circuit Judges, BOWNES, Senior Circuit Judge.

SELYA, Circuit Judge.

This appeal requires us to assess the constitutionality of N.H.Rev.Stat.Ann. (RSA) ch. 167:27 (1977 & Supp.1989), which bars recipients of state aid to the permanently and totally disabled (APTD) from receiving general public assistance (known locally as "town welfare").[1] In our view, RSA 167:27 does not deprive the plaintiff, or others similarly situated, of rights secured under the federal Constitution. Hence, we reverse a contrary ruling of the district court.

## I. THE STATUTORY SCHEME

The State of New Hampshire administers various public assistance programs, including old age assistance (OAA), aid to the needy blind (ANB), aid to families with dependent children (AFDC), and APTD. Grant levels for the three so-called adult assistance programs (OAA, ANB, APTD) are identical; the grant level for an AFDC household of one is marginally lower. Recipients of federal supplemental security income (SSI) are eligible for Medicaid in New Hampshire only if they also qualify for one of the three adult assistance programs.

---

1. RSA 167:27 provides in pertinent part:
   No person receiving old age assistance or aid to the permanently and totally disabled under this chapter or RSA 161 shall at the same time receive any other relief from the state, or from any political subdivision thereof, except for medical and surgical assistance, and the acceptance of such relief shall operate as a revocation of old age assistance or aid to the permanently and totally disabled.

Prior to 1986, the towns, cities, counties, and State all contributed to funding the APTD program. *See* RSA 167:20 (1977). The parties agree that legislation taking effect on January 1 of that year exempted the cities and towns from direct fiscal obligations in respect to APTD and OAA, leaving the counties and the State to bear the immediate fiscal burden of these programs. The municipalities still provided indirect support to APTD and OAA, however, in that the wellspring of the counties' revenue stream is the local property tax collected by the cities and towns. *See* RSA 29 (1977 & Supp.1989).

No statewide program of general public assistance exists in New Hampshire. Instead, state law requires each city and town to help persons who are unable to support themselves.[2] The purpose of town welfare is to provide financial assistance to any person who is impoverished, and who, because of lack of income, is unable to pay for necessary living expenses. Funding comes strictly from local property taxes. Each municipality develops guidelines for administering the program and determining eligibility. *See* RSA 165:1 (Supp.1989). The parties agree that town welfare is not designed to accommodate people with a chronic need for funds, but serves primarily as a bridge, supplying temporary or emergency support until other, more enduring sources of relief can be arranged.

RSA 167:27, *supra* note 1, is superimposed upon this programmatic grid and, as mentioned earlier, trumps the applicability of RSA 165:1 in cases where, as here, APTD grant funds are being paid. A person eligible for APTD cannot renounce his or her eligibility, or refuse to accept benefits, merely to retain access to town welfare. *See* RSA 165:1-b, subd. I(d) (Supp. 1989) (providing for forfeiture of town welfare eligibility if applicant fails to make required applications to "other public assistance agencies"); *see also* City of Concord Public Assistance Guidelines, Eligibility Standards, IV–B–4.

## II. STATEMENT OF THE CASE

The facts of this case are uncontested, if unhappy. Plaintiff-appellee Teresa Baker, a victim of cancer, began receiving maximum APTD benefits ($382 monthly) from the New Hampshire Division of Human Services (DHS) in August 1988, when she was no longer able to work. She also received food stamps (valued at $78 per month in 1988 and $90 per month in 1989) under a state-administered federal program. She could not subsist on these payments. In 1988, her basic needs, excluding food, cost $469 per month at a minimum (her rent alone was $375), leaving her $87 short.

Because Mrs. Baker's APTD benefits were not adequate to meet her necessary living expenses, she applied for general assistance pursuant to RSA 165:1 from the welfare department of her home municipality, the City of Concord (City). Her application was denied. In the spring of 1989, she asked the City for help with her electric bill and was again refused. Both denials were based solely on RSA 167:27. It is undisputed that, under the City's guidelines, Mrs. Baker would have been eligible for general assistance had state law not barred her participation.

Invoking 42 U.S.C. § 1983, plaintiff sued the City and the director of DHS, Robert Pliskin, in federal district court. She alleged that the blanket denial of general assistance discriminated against persons already receiving APTD benefits and therefore transgressed the fourteenth amendment to the federal Constitution. Specifically, plaintiff maintained that RSA 167:27, on its face and as administered by DHS, violated the Equal Protection Clause. The law, she said, created two classes of persons: (1) those who are poor, disabled, and receiving APTD benefits, and (2) those who are poor, not disabled, and not receiving APTD benefits. While the members of both classes are equally unable to support

**2.** RSA 165:1 (1977 & Supp.1989) provides in relevant part that:

Whenever a person in any town is poor and unable to support himself, he shall be relieved and maintained by the overseers of public welfare of such town, whether or not he has residence there.

themselves, New Hampshire discriminates between the classes, according to the plaintiff, because persons in the first group are barred from town welfare whereas persons in the second group are eligible for such assistance (and, under it, can receive whatever sums are necessary for their subsistence, not subject to APTD's monthly cap). In addition to her equal protection initiative, Mrs. Baker alleged that a denial of town welfare based on RSA 167:27 likewise violated the Due Process Clause by creating an irrebuttable presumption that an APTD recipient is not, and cannot be, in need of general assistance.

*Inter alia,* plaintiff sought a permanent injunction preventing the defendants from relying on RSA 167:27 in order to deny assistance under RSA 165:1; a declaration that RSA 167:27 was unconstitutional; and an order of notice directed to all persons previously denied town welfare by reason of RSA 167:27. Her complaint was accompanied by a motion to certify a class consisting of all persons who receive or will receive APTD benefits and whose applications for town welfare are or have been denied "based, in whole or in part, on RSA 167:27; and whose APTD benefits will be revoked under RSA 167:27 upon receipt of general assistance under RSA 165." The district court, noting that anyone receiving benefits under RSA 167:27 would be automatically excluded from town welfare, certified the class.

Once the suit was answered, all parties sought summary judgment. The court below granted plaintiff's motion reasoning that, because eligibility under RSA 165 was predicated solely on need, it was irrational to exclude APTD recipients from town welfare[3] while at the same time permitting recipients of certain other categorical grant programs (for example, ANB or AFDC) to receive "bridge" payments remedying shortfalls between their regular stipends and costs of subsistence. The court therefore concluded that RSA 167:27 was bereft of any rational basis and contravened the

Equal Protection Clause. Because this holding gave plaintiff all the relief which she sought, the court did not reach the due process claim. These appeals followed.

## III. THE EQUAL PROTECTION CLAIM

■ Social welfare or public assistance legislation runs afoul of the Equal Protection Clause only if it cannot be said to relate rationally to a legitimate state objective. *See, e.g., Lyng v. International Union, Etc.,* 485 U.S. 360, 370, 108 S.Ct. 1184, 1191–92, 99 L.Ed.2d 380 (1988); *Department of Agriculture v. Moreno,* 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973); *Garvey v. Worcester Housing Auth.,* 629 F.2d 691, 696 (1st Cir.1980). In identifying a state interest and assessing whether the statutory scheme can be said to further that interest, courts must be careful not to usurp legislative prerogatives; considerable respect should be accorded to legislators' views regarding the contours of social welfare programs. "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket." *Jefferson v. Hackney,* 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972).

Transforming this respect into practice requires that, in general, legislative classifications be "presumed to be valid." *Lyng,* 485 U.S. at 370, 108 S.Ct. at 1191–92; *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). Imperfections in classifications, whether or not undesirable, cannot automatically be equated with violations of equal protection. *See Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Id.* (quot-

---

**3.** The challenged law affects OAA recipients in exactly the same way as it affects APTD recipients. Nevertheless, because Mrs. Baker was not receiving OAA, and no other plaintiff was named, the district court's ruling was appropriately limited to persons participating in the APTD program.

ing *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)); *see also Garvey*, 629 F.2d at 696. Each social problem suggests a variety of constitutionally permissible solutions and the obligation of choosing among the array rests primarily with the States. *See Jefferson*, 406 U.S. at 546–47, 92 S.Ct. at 1731–32.

The Equal Protection Clause, then, does not force a state legislature to choose between "attacking every aspect of a problem or not attacking a problem at all." *Dandridge*, 397 U.S. at 487, 90 S.Ct. at 1162; *see also Lyng*, 485 U.S. at 370, 108 S.Ct. at 1191–92. By much the same token, government's resources are finite, and welfare legislation need not provide the same level of benefits to all recipients. *See Doe v. Gaughan*, 808 F.2d 871, 883 (1st Cir.1986). The State may, constitutionally, attempt to steer between Scylla and Charybdis, addressing in good faith only one aspect, or a few aspects, of a multifaceted problem. *See Garvey*, 629 F.2d at 696.

■ Consistent with the principle of respecting a State's policy choices, the burden of proving that a state regulation is not rationally related to a legitimate governmental interest is on the challenger. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 723–24, 66 L.Ed.2d 659 (1981). The burden is more than nominal: "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). *See also Sullivan v. Stroop*, —— U.S. ——, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990); *Bowen v. Gilliard*, 483 U.S. 587, 601, 107 S.Ct. 3008, 3017, 97 L.Ed.2d 485 (1987); *Dandridge*, 397 U.S. at 485, 90 S.Ct. at 1161–62; *Montalvo–Huertas v. Rivera–Cruz*, 885 F.2d 971, 978–79 (1st Cir. 1989). A court may not "overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the only logical conclusion is] that the legislature's actions were irrational." *Vance v. Bradley*, 440

U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979). It follows that the plaintiff, challenging, had the burden in this case of demonstrating "that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* at 111, 99 S.Ct. at 949; *see also Montalvo–Huertas*, 885 F.2d at 979.

Despite the presumption of rationality, courts have sometimes been unable to find a rational basis for state welfare schemes. In *Medora v. Colautti*, 602 F.2d 1149 (3d Cir.1979), for example, the Third Circuit found none of the theoretical justifications proffered by the State of Pennsylvania adequate to uphold a regulation under which blind, aged, or disabled persons were required to apply for federal SSI benefits and, if determined to be ineligible for those benefits for other reasons, were automatically denied general assistance. Since SSI had stricter eligibility criteria than Pennsylvania's general assistance program, the panel found it "irrational" to have a determination based on the former control a decision under the latter. *Id.* at 1153–54. Other justifications *e.g.*, conserving state funds by encouraging exhaustion of federal sources of aid, presented valid reasons for requiring applicants to apply for SSI but not for denying assistance to those who were refused federal support. *Id.* at 1154–55.

Similarly, in *Ranschburg v. Toan*, 709 F.2d 1207 (8th Cir.1983), the Eighth Circuit struck down a Missouri regulation which limited the class of needy, disabled persons eligible to get financial assistance for heating costs to those who received certain other benefits. The State's argument that the challenged classification was rationally based because it allocated the limited funding available to the neediest individuals was rejected on the ground that some of the proxy programs were not based on need. *Id.* at 1210. The court of appeals gave short shrift to Missouri's contention that, since heating assistance was merely a supplement, it could be awarded however the legislature saw fit, stressing that States do not have "unbridled discretion" in the area of social welfare; "[t]hey must

still explain why they chose to favor one group of recipients over another." *Id.* at 1211. To accept the State's contention that the challenged classification was rationally based merely because the legislature elected to provide the benefits to some totally disabled persons and not to others "would, in effect, render the rational basis test a nullity and would 'suspend the operation of the Equal Protection Clause in the field of social welfare law.'" *Id.* (quoting *Hagans v. Lavine,* 415 U.S. 528, 539, 94 S.Ct. 1372, 1380, 39 L.Ed.2d 577 (1974)).

While *Medora, Ranschburg,* and decisions like them, *see, e.g., Morales v. Minter,* 393 F.Supp. 88 (D.Mass.1975), plot no bright lines, they do suggest that there are limits as to both what qualifies as a legitimate government objective and what means will be deemed rationally related to the objective's achievement. We think that the case law, weighed without a thumb on the scales, aptly illustrates that courts, in conducting a constitutional review, will not rubber-stamp state officials' rationales to justify challenged statutes. A critical, if highly deferential, examination is called for, to be conducted case by case with an awareness that statutes such as are at issue here enjoy a "presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 462, 108 S.Ct. 2481, 2489, 101 L.Ed.2d 399 (1988); *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981). Unless such a showing can be made, an equal protection challenge is doomed to failure, for "[n]either the wisdom nor actual efficacy of the legislative judgment is before us." *Montalvo–Huertas,* 885 F.2d at 981.

■ Appellants, recognizing the latitude provided by rationality review, take a cafeteria-style approach. They offer a variety of theoretical justifications for RSA 167:27 and invite us to choose among them. Since the devoir of persuasion rests with the plaintiff, and since we find one weapon in appellants' asseverational arsenal powerful enough to pass equal protection muster, our inquiry may be circumscribed accordingly.[4]

Public funding to assist the disadvantaged is, of course, not limitless. Historically, the burden has been shared in varying degrees by federal, state, and local agencies. We have attached hereto an appendix, extracted from appellee's brief, delineating a number of public assistance programs available to New Hampshire residents and indicating the funding source for each program. It is notable that, alone among New Hampshire's assortment of welfare benefit models, APTD and OAA tap into a unique county-state funding source. Appellants argue that this very distinction—the counties' participation in funding APTD and OAA—furnishes a rational basis for the restrictions placed on the beneficiaries of these programs.

Appellants' thesis, as we understand it, runs along the following lines. Because New Hampshire counties have no general taxing powers or established revenue streams, the county treasurer can only raise the money necessary for the operation of county government by assessing the constituent cities and towns within the county. Thus, where the county underwrites 50% of a particular program, as is true of APTD and OAA, it is the municipal taxpayers who actually foot the bill. It is sensible, then, the argument continues, that since the cities and towns are already providing substantial support to individuals receiving APTD and OAA through the medium of the counties), the same units of government should not be further burdened with a requirement to underwrite town welfare for the benefit of the same persons. Moreover, the thesis suggests a corollary proposition: that APTD and OAA recipients can rationally be distinguished from ANB and AFDC recipients in that the former's needs for supplemental public assistance are more likely, on the whole, to be chronic.

---

4. To be sure, some of the alternatives which appellants hawk are unconvincing—but one rational basis is all that is needed to save the statute. And in this case, as we shall illustrate, the State's professed basis has dual components.

We find the major premise of this analysis to be constitutionally convincing. We believe the New Hampshire legislature could reasonably have concluded that town welfare should be restricted so as to exclude individuals already receiving relief from programs partially funded by the cities and towns. The State may legitimately have determined that the contribution provided by the cities and towns to APTD met the "fair share" financial obligation of local government to those receiving such aid. Short of impermissibly invading the legislative domain, we cannot deduce that it was beyond the State's legitimate interest to provide benefits to the largest number of needy persons consistent with the limited availability of public funds and simultaneously to apportion financial responsibility equitably among the cities, towns, counties, and State.

For this reason, we are constrained to reject plaintiff's conclusion that RSA 167:27 unlawfully discriminates against impecunious persons who happen to be totally disabled by treating them differently than, say, equally impoverished recipients of ANB or AFDC grants. Because programs such as ANB and AFDC depend on funding mechanisms different from that which drives APTD, and because the municipalities do not contribute to the support of those programs, either directly or through the counties, there is a rational basis for applying a different set of eligibility rules.

The second premise on which the State's distinction might rest—durational differences stemming from the likely persistency of need—also distinguishes APTD and OAA from ANB and AFDC. As we understand the historical development of public assistance in New Hampshire, the State's town-based general assistance program, first conceived in 1885, has always been oriented to short-term requirements. This program has been meant primarily to furnish emergency assistance, requiring each municipality to support the impoverished physically within its boundaries from time to time, whether resident there or not, on a temporary basis until they found work or longer-term relief, if necessary, was arranged. Town welfare, it may be thought, was not designed to accommodate people with chronic needs or to support indigent people over prolonged periods of time.

More recently, the State, often with federal financial help, has established other welfare programs, administered at the state level, to provide longer-term support to specific categories of needy people, including the aged, the blind, families with dependent children, and the permanently and totally disabled. In the process, the legislature has had to balance the needs of these groups against the mischief of overly burdensome taxation. We think it rational—albeit not inevitable—for the legislature to have struck this balance in a fiscally conservative fashion, notwithstanding that the resultant pool of resources proves inadequate to fund general welfare assistance fully. *See, e.g., Lyng*, 485 U.S. at 373, 108 S.Ct. at 1193–94. Faced with the necessity of making painful choices in the distribution of scarce benefits among competing groups, all deserving, the legislature could have rationally determined that those who are chronically needy and who will thus impose a burden of indefinite—but likely lengthy—duration on the taxpayers should be funded at a fixed rate lower than the full standard of subsistence provided under town relief to the temporarily needy.

If we are not to "second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients," *Dandridge*, 397 U.S. at 487, 90 S.Ct. at 1163, then we must honor New Hampshire's decision. The Constitution, when all is said and done, allows a State to help some deserving groups more than others. *See Gaughan*, 808 F.2d at 883 ("When a state decides to confer a benefit upon a segment of its population, it may decline to provide the exact same level of benefits to another segment, so long as its decision is rational.").

To be sure, given that the statutory scheme allows the recipients of ANB and AFDC grants to get town welfare to meet full subsistence, the State has not drawn a perfect classificatory distinction between the temporarily and chronically unemploya-

ble. The legislature could have concluded, however, that whereas the permanently and totally disabled are, by definition, chronically unemployable, the blind have the potential to develop skills in order to support themselves (or the legislature, in deciding how to allocate finite resources, might have been mindful of the quantitative difference between the two groups, *i.e.*, common sense suggests that the blind may comprise a smaller group than the permanently and totally disabled). Similarly, the legislature may have thought that, whereas old age is irreversible, children in AFDC families grow up and cease being dependent; either they (or their able-bodied parents) eventually become able to assume the responsibility of meeting their own needs. By definition, the permanently and totally disabled never can do so.

Nor does this suggested rationale falter because the town welfare model fails to draw a bright-line distinction between short-term and long-term assistance. While under the existing scheme, it is possible that some blind persons or dependent children might require, and receive, assistance for a longer spell than some APTD and OAA recipients, the fact that the legislature did not make this temporal distinction "with mathematical nicety" does not mean that its actions were irrational. *Dandridge*, 397 U.S. at 485, 90 S.Ct. at 1161–62. By the same token, the fact that the distinction "in practice ... results in some inequality" does not offend the Constitution. *Id.*

We believe that this assessment of the statutory scheme, positing a biaxial basis for the distinction which New Hampshire has drawn, withstands testing in the crucible of the case law. The Supreme Court has lately held that the efficient and economical operation of public programs is a legitimate governmental goal. *Lyng*, 485 U.S. at 373, 108 S.Ct. at 1193–94. This does not mean that the legislature may pursue its objective mindlessly or by invidious discrimination against individuals or groups of individuals—but judicial review of the distinctions drawn by lawmakers "in order to make allocations from a finite pool of resources must be deferential." *Id.*

We think that the teaching of *Lyng*, a public funding case, indicates quite clearly that courts must also respect legislative determinations regarding sources of available funds. States, acting through elected officials responsive to the voters, are presumably in a better position than federal judges to assess and assign the financial burdens fairly to be imposed upon the citizenry. Appellants' suggested rationale for allowing ANB and AFD recipients to obtain town welfare, while excluding their APTD and OAA counterparts, seems wholly consistent with the exercise of these functions. Thus, New Hampshire's scheme furthers legitimate state goals and appears, without serious question, to be rationally related to their accomplishment.

*Lyng* notwithstanding, plaintiff argues that a trilogy of earlier Supreme Court opinions requires us to strike down RSA 167:27. Read in context and proper perspective, however, the cited authorities do not support her position.[5]

At oral argument, plaintiff identified *Jefferson*, 406 U.S. 535, 92 S.Ct. 1724, as her most formidable precedent. There, the State of Texas reduced benefit levels of most welfare programs because of funding limitations, cutting AFDC grant levels by a greater percentage than other programs (including APTD, OAA, and ANB). A class of AFDC beneficiaries challenged the enactment. The Court, viewing the case as one where budgetary constraints did not allow payment of the full standard of need for all welfare recipients, upheld Texas' chosen course, observing that it would not be irrational for the State to "have concluded that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living." *Id.* at 549, 92 S.Ct. at 1733.

---

**5.** Plaintiff also relies on lower court cases such as *Medora* and *Ranschburg,* discussed *supra* pp. 748–49. These cases merely apply the Supreme Court's teachings to state regulations distinguishable from New Hampshire's panoply of public assistance programs. They add nothing, therefore, to the sum of plaintiff's arguments.

Focusing singlemindedly on this language, plaintiff visualizes *Jefferson* as standing for the proposition that statutes which provide a lower level of funding for the aged and infirm than for other disadvantaged persons are *ipso facto* unconstitutional. But, plaintiff confuses *Jefferson's* result with its *ratio decidendi*. She overlooks the Court's statement that where budgetary constraints prevent payment of the full needs of all welfare recipients, "different policy judgments are, of course, possible." *Id.* Here, New Hampshire has made such a judgment: that the disabled and the elderly, who already are supported in some measure by municipal resources, can—unlike, say, the blind, whose grants are not subsidized by the municipalities—fairly be excluded from participation in a supplemental relief program funded by the towns. Whether or not one agrees with this determination, there is nothing in the Constitution that prohibits it. Read in context, *Jefferson* constitutes a strong reaffirmation of the Court's respect for legislative judgments in social welfare matters, and hence, for the position urged by the appellants in the case at bar.

Plaintiff relies on *Jefferson* in another way as well. She maintains that the discrimination flowing from RSA 167:27 is more severe than that which transpired in *Jefferson* because the present statute does not simply limit the amount of town welfare that an APTD recipient can receive but denies benefits altogether. The district court accepted this distinction and proceeded to find that the exclusion lacked any rational basis. But the lens of constitutional inquiry cannot be so narrowly concentered. Rather than focusing exclusively on the unavailability of town welfare to those needy persons in plaintiff's shoes, a reviewing court must view the statutory scheme as a whole. Plaintiff is, after all, receiving benefits—not as much, perhaps, as she wants, or needs, but benefits nonetheless—under the APTD program. There is no preclusion from all assistance. In any event, even if the plaintiff were totally denied benefits, the contours of rationality review would remain unchanged. *See Lyng*, 485 U.S. at 370–74, 108 S.Ct. at 1191–94 (upholding against equal protection challenge a statute totally excluding strikers from the federal food stamp program).

Plaintiff next invokes *Dandridge*, 397 U.S. 471, 90 S.Ct. 1153. There a Maryland welfare regulation placed an absolute dollar limit on the amount of monthly AFDC grants, regardless of family size. As a consequence, the per capita grant for each succeeding child in large families was reduced so that the total family grant was less. The Court nevertheless discerned a valid basis for the regulation in the "State's legitimate interest in encouraging employment and in avoiding discrimination between welfare families and the families of the working poor." *Id.* at 486, 90 S.Ct. at 1162. Although the regulation's taxonomy was imperfect—for instance, the State's rationale might not work where, as was true of the named plaintiffs' families, *see id.* at 486 n. 20, 90 S.Ct. at 1162 n. 20, no family member was employable—the imperfections did not undermine the statute or change the Court's holding.

Again conflating result and reasoning, Mrs. Baker reads *Dandridge* as decreeing that the "disabled poor," whether young or old, blind or sighted, must be treated identically. We disagree. *Dandridge*, like *Jefferson*, does not mandate that only certain rationales will support a State's allocation of its welfare funds. Instead, it fortifies the idea that a statutory discrimination will not be set aside if any set of facts reasonably may be conceived to justify the classification. The lesson of *Dandridge* is that:

> [T]he Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy.
>
> . . . .
>
> . . . It is enough that the State's action be rationally based and free from invidious discrimination.

*Id.* at 486–87, 90 S.Ct. at 1162. RSA 167:27 meets this test. Because the distinction drawn rests upon a sufficiently solid foundation, it complies with the *Dandridge* imperative.

The third pillar upon which plaintiff's argument reposes is *Bowen v. Gilliard,* 483 U.S. 587, 107 S.Ct. 3008. There, the Court upheld a federal requirement that child support payments for one child could be counted as income to the entire household unit, resulting in reduced welfare grants for some AFDC households. *Id.* at 603, 107 S.Ct. at 3018. In examining the statutory mosaic, the Court determined that Congress had a legitimate goal (reducing federal expenditures) and that the challenged law served that goal. *Id.* at 599, 107 S.Ct. at 3016. The Court found the rationality of the law supported, too, by the government's interest in "distributing benefits among competing needy families in a fair way." *Id.*

Seizing upon this statement, Mrs. Baker contends that fairness is the linchpin of the Court's equal protection analysis. She characterizes *Gilliard* as a case where the statutory scheme was upheld principally because it treated needy families fairly and submits that *Jefferson* and *Dandridge* are cast in the same mold. We do not think the cases can be read in so simplistic a manner. At bottom, the trilogy exemplifies that, when called upon to evaluate social welfare legislation, the Court will address its inquiries not to subjective notions of fairness or social policy *per se*, but to whether a legitimate state goal can be identified, and if so, whether the regulation at hand furnishes a rational means of attaining the goal. Indeed, the doctrinal glue which binds the cases together is that the Court, throughout, has refrained from "second-guess[ing] state officials" in their allocation of scarce public resources. *See Dandridge,* 397 U.S. at 487, 90 S.Ct. at 1162–63. It follows that the judicial task, properly understood, does not involve substituting judicial value judgments for legislative ones.

Although New Hampshire's scheme may not be one we find appealing as a matter of policy,[6] it bears a rational relationship to the legitimate governmental objective of allocating the welfare burden equitably among available funding sources. Having determined that the financial assistance provided by the cities and towns is finite and cannot meet the full standard of need in all cases, the legislature was entitled to decide in whatever rational way it preferred which categorical grant recipients could be expected "to bear the hardships, of an inadequate standard of living." *Jefferson,* 406 U.S. at 549, 92 S.Ct. at 1733; *accord Gilliard,* 483 U.S. at 599, 107 S.Ct. at 3016 (acknowledging Congress' judgment of fairness to be an appropriate criterion for distribution of benefits).[7] The classification ultimately selected, is both ungenerous and ragged around the edges—but it is constitutionally acceptable.

A comparison with *Jefferson,* where Texas drew distinctions based not on the source of available funds but on the recipients' status, illustrates the point. Concededly, New Hampshire's principle—that persons who are already supported by municipal resources cannot also receive supplemental relief from municipal coffers—differs in practice from Texas' principle, and leads to different results. Yet, the two principles constitute equally rational means of endeavoring to allocate limited welfare funds in a fair way. In *Jefferson,* the result of the challenged scheme was to provide only 75% of the determined standard of need to AFDC recipients but 95% to the blind and disabled and 100% to the aged. 406 U.S. at 545, 92 S.Ct. at 1730–31. Here, the result is to meet all of the necessary living expenses of blind recipients and families with dependent children but not those of the aged and disabled. Neither result is perfect. At a minimum, each in-

---

6. The policy choice, of course, cannot be viewed in a vacuum. Given the limited resources available, insistence upon a more even-handed distribution of public funds could potentially result not in making town welfare available to APTD and OAA recipients, but in a legislative denial of that benefit to those who receive funds from the other categorical grant programs.

7. Considering the particular plight of Mrs. Baker, "[w]e acknowledge that the effect of the regulation seems unfair in the particular circumstances of this case." *Sprandel v. Secretary of HHS,* 838 F.2d 23, 27 (1st Cir.1988) (per curiam). Still, if the line were to be redrafted, "we do not doubt that it would then chafe other, equally deserving recipients." *See id.*

volves the agonizing choice of who should bear the brunt of a shortfall in welfare funding. Debating the relative fairness of the approaches is as frustrating (and inconclusive) as debating how many angels can dance on the head of a pin. Nonetheless, if the case law has left us with a unifying theme, it is that such difficult policy choices, within broad limits, are for legislators, not federal judges, to make.

The short of it is that, applying the traditional standard of review, we cannot say that New Hampshire's decision to deny town welfare to individuals receiving APTD benefits is invidious or irrational. Rather, we must conclude that the statutory scheme "constitutes a seemingly reasonable selection of one of out of several plausible alternatives." *Sprandel v. Secretary of HHS*, 838 F.2d 23, 27 (1st Cir.1988) (per curiam). Because the challenger has not shown that "the statute's classification 'rests on grounds wholly irrelevant to the achievement of the State's objective,'" *Kadrmas*, 487 U.S. at 462, 108 S.Ct. at 2489 (quoting *McGowan*, 366 U.S. at 425, 81 S.Ct. at 1105), we are bound by the solid weight of authority to uphold RSA 167:27 in the face of Mrs. Baker's equal protection initiative.

## IV. THE DUE PROCESS CLAIM

■ Inasmuch as the district court struck down the statute on equal protection grounds, it had no need to reach plaintiff's due process argument. We enjoy no comparable luxury. Plaintiff's able counsel preserved the point for appeal, and we turn to it now.

Refined to bare essence, Mrs. Baker asserts that RSA 167:27 violates the Due Process Clause by creating an irrebuttable (and inaccurate) presumption that APTD recipients are not needy. The central feature of town welfare under RSA 165:1, she maintains, is the concept of eligibility based on need. Because RSA 167:27 does not give an APTD recipient any opportunity to show that she requires town welfare, over and above APTD, in order to subsist, it presumes that her APTD income is adequate to satisfy her basic needs. Such a presumption offends the Due Process Clause, plaintiff says, since it assumes a fact—adequacy of the APTD grant—which is not necessarily or universally true and which robs an impecunious person of her entitlement to town welfare while precluding an individualized assessment of her straits. Although ingeniously crafted, the argument is flawed in several critical respects.

In the first place, plaintiff's interpretation of RSA 165:1 exhibits a sort of tunnel vision, overlooking that, insofar as the law makes need a criterion of eligibility for town welfare, such a criterion cannot be separated from its statutory origin. Thus, when the New Hampshire legislature modified RSA 165:1 by enacting RSA 167:27, it modified the neediness standard as well. Put another way, the legislature did not create an irrebuttable presumption; it merely altered the eligibility criteria by redefining need. That plaintiff and persons similarly situated were disadvantaged by the change does not necessarily betoken a constitutional infirmity.

Plaintiff's citation to *Baker–Chaput v. Cammett*, 406 F.Supp. 1134 (D.N.H.1976), is unavailing. To be sure, the *Cammett* court (Bownes, J.) found financial need and an ability to support one's self to be the sole criteria for eligibility under RSA 165:1. *Id.* at 1137. Yet, *Cammett* concerned state statutory law as it stood at an earlier date—not federal constitutional requirements. When RSA 167:27 was amended, well after *Cammett* had been decided, the legislature's redefinition of the statutory criteria rendered *Cammett* of limited relevance for purposes of today's inquiry.

Plaintiff's reliance on *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), and *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), is also misplaced. *LaFleur* and *Vlandis* are not controlling with regard to rights such as are at issue here. *See Weinberger v. Salfi*, 422 U.S. 749, 772–73, 95 S.Ct. 2457, 2470–71, 45 L.Ed.2d 522 (1975) (holding *LaFleur*, *Vlandis*, and their progeny to be inapposite in respect to non-

contractual claims to receive monies from the public fisc).

Last but not least, *Salfi* serves to undercut plaintiff's due process argument in its entirety. In *Salfi*, the Court observed that *Dandridge* "quite plainly laid down the governing principle for disposing of constitutional challenges to classifications in this type of social welfare legislation." *Id.* 422 U.S. at 770, 95 S.Ct. at 2469. Where no fundamental liberty is involved, "a noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status." *Id.* at 772, 95 S.Ct. at 2470. In such a case, the Due Process Clause can be thought to interpose a bar only if the statute "manifests a patently arbitrary classification, utterly lacking in rational justification." *Id.* at 768, 95 S.Ct. at 2468 (quoting *Flemming v. Nestor*, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)). As in the equal protection milieu, if the State's objective is legitimate and the taxonomy adopted is rationally related to achieving that objective, then the law does not transgress due process. *See id.* 422 U.S. at 769, 95 S.Ct. at 2468–69; *Richardson v. Belcher*, 404 U.S. 78, 84, 92 S.Ct. 254, 258–59, 30 L.Ed.2d 231 (1971). Even the fact that legislation may be over-inclusive or underinclusive with regard to its goal does not signify that a rational relationship is lacking. *Salfi*, 422 U.S. at 776, 95 S.Ct. at 2472.

In sum, *Salfi* explicitly adopted the *Dandridge* equal protection analysis in regard to due process challenges to social welfare legislation. As a result, the due process and equal protection standards to be applied in cases like this one are essentially the same. Here, the plaintiff, being unable to show that RSA 167:27 lacks a rational basis, failed to carry her equal protection burden. *See supra* Part III. Her due process argument inevitably falters on the same grounds.

## V. CONCLUSION

The Supreme Court has cautioned that "the intractable economic, social and even philosophical problems presented by public welfare assistance programs are not the business of [the federal judiciary]." *Dandridge*, 397 U.S. at 487, 90 S.Ct. at 1163. Hence, our role in reviewing such measures is limited. We cannot decide this case, as plaintiff would prefer, based on our views as to whether New Hampshire's welfare scheme is as fair as possible, or truly humanitarian, or even well-advised. Rather, since RSA 167:27 does not work a deprivation of equal protection or due process under established principles of rationality review, we are bound to hold that the district court erred in declaring it unconstitutional.

This holding renders academic the appellants' remaining assignments of error. While it is not clear whether the statutory construction argument advanced by the amicus is similarly moot, we decline to address it. We have ruled before, and today reiterate, that on appeal, an amicus may not interject into a case issues not briefed or argued by the litigants. *See, e.g., Lane v. First Nat'l Bank*, 871 F.2d 166, 175 (1st Cir.1989).

We need go no further. The judgment appealed from is reversed and the cause is remanded with instructions to vacate the injunction heretofore issued and to enter judgment in accordance with this opinion.

Reversed and remanded.

APPENDIX

## NEW HAMPSHIRE WELFARE BENEFIT PROGRAMS

| Benefit Program | Persons Eligible | Source of Funds | Government which Administers | Government which sets Standards |
|---|---|---|---|---|
| **TOWN** | | | | |
| 1. **Town Welfare** RSA 165:1, I | Poor and in need | Local Property Tax | Town | Town |
| **STATE** | | | | |
| 2. **APTD** Aid to Permanently and Totally Disabled RSA 167:6 VI | Low Income Adults 18-64 Permanently and Totally Disabled | County and State | State | State |
| 3. **OAA** Old Age Assistance RSA 167:6, I | Low Income Adults, 65 and Over | County and State | State | State |
| 4. **ANB** Aid to Needy Blind RSA 167:6, IV | Low Income Blind Adults | State | State | State |
| 5. **AFDC** Aid to Families with Dependent Children 42 U.S.C. §601 R.S.A. 167:6, V | Low Income Families with Dependent Children | State and Federal | State | Federal and State |
| **FEDERAL** | | | | |
| 6. **Food Stamps** 7 U.S.C. §2011 | Lower Income Households | Federal | State | Federal |
| 7. **SSI** Supplemental Security Income 42 U.S.C. §1381 | Low Income Aged, Blind or Disabled | Federal | Federal | Federal |