USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1630

 DANIEL SPLUDE & RONALD CARGILL,

 Plaintiffs, Appellants,

 v.

 KENNETH S. APFEL, SOCIAL SECURITY ADMINISTRATION COMMISSIONER,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Gene Carter, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Coffin and Bownes, Senior Circuit Judges.
 

 Michael A. Bell with whom Jon Holder was on brief for
appellants.
 Christine N. Kohl, Appellate Staff, Civil Division, with whom
Frank W. Hunger, Assistant Attorney General, Jay P. McCloskey,
United States Attorney, and Barbara C. Biddle, Appellate Staff,
Civil Division, were on brief for appellee.

January 15, 1999

 
 

 BOUDIN, Circuit Judge. It is no accident that Title 42,
containing the social security laws among other statutes, occupies
four successive volumes of the United States Code (the Internal
Revenue Code requires only two volumes). This case turns on the
interplay of statutes establishing two different social security
programs and several ancillary provisions. A brief primer will be
helpful.
 The most familiar social security program is federal old
age, survivors and disability insurance, the core provisions of
which were adopted as part of the New Deal in 1935. 42 U.S.C. 
401-433. It is based on contributions made by employees and their
employers to the social security trust fund, and it primarily
provides retirement income. But if an insured worker becomes
disabled before retirement, scheduled benefits are payable to the
employee during disability. Id. 401(b), 423. The latter
payments are called "social security disability" or "SSD."
 In 1972, Congress added a new social security program to
provide "supplemental security income" (called "SSI") for "aged,
blind and disabled" persons of limited means regardless of their
insured status. 42 U.S.C. 1381a, 1382. This is a social
welfare program funded out of general taxpayer revenues. SSI is
available even to those who qualify for SSD, but SSD income is
considered in determining whether a disabled person qualifies for
SSI under the latter's means test. Id. 1382a(a)(2)(B),
(b)(4)(B). A disabled person who qualifies for payments under both
programs is called a "concurrent claimant."
 This case concerns two concurrent claimants, Daniel
Splude and Ronald Cargill. Splude's circumstances are
illustrative. He applied in 1992 for both SSD and SSI benefits
dating back to 1988. While awaiting a determination of disability
by the Social Security Administration (which administers both
programs), Splude received relief payments from the Maine
Department of Human Services. He signed an agreement with the
Social Security Administration authorizing it to deduct from
Splude's initial SSI payment that portion of the interim relief
provided by Maine that was not itself funded by the federal
government.
 There is a broad "anti-assignment" law governing SSD
payments and applicable to SSI payments by cross-reference, 42
U.S.C. 407(a), 1383(d)(1), reprinted in the appendix to this
opinion. However, Splude's 1992 agreement with the Social Security
Administration, committing his SSI funds to repay interim state
aid, is specifically permitted by a proviso to the cross-referenced
statute limiting assignment of SSI payments. Id. 1383(g)(1). 
This statutory exception does not apply to SSD payments; if Splude
had attempted to assign his rights to future SSD payments to the
Maine agency, the Social Security Administration would not have
been allowed to make such a deduction.
 In addition to this relationship of federal and state
payments, there is a potential interaction between SSD and SSI
payments. As already noted, SSD payments due for any month are
treated under the SSI means test as income that may reduce or
eliminate SSI payments for the same month. One might expect that
the Social Security Administration would always make both
calculations at the same time, determining SSD payments due to the
applicant and then reducing SSI payments to the extent required. 
But different information is needed for the two calculations (e.g.,
because SSI is means tested), and SSD is normally computed at field
offices and SSI at a central Maryland office.
 During the events in this case, the Social Security
Administration generally paid out whichever claim was computed
first, whether SSI or SSD. Further, an applicant might not apply
for disability payments as soon as entitled to do so. Thus,
eventually the applicant might receive a large SSI check for back
payments; and later, when SSD was calculated, the SSI payment might
prove to have been overstated because the SSD payment--made later
for the same period--reduced the amount of (means-tested) SSI
properly due for the same period.
 This overpayment problem was met by the so-called
"windfall offset" provisions first added in 1980 and later amended
in 1984, 42 U.S.C. 1320a-6(a), reprinted in the appendix. Under
this provision, an excess initial payment for SSI caused by the
delay just described can be recaptured by the Social Security
Administration by deducting the excess when the SSD payment is
later calculated and ready to be paid. In September 1995, the
Social Security Administration abandoned its "pay whichever claim
is calculated first" policy and now, we are told, calculates SSI
and SSD benefits at the same time so as to avoid any windfall. But
the old policy was in effect in April 1993 when the Social Security
Administration first found that Splude was disabled and had been
for a prior period.
 In May 1993, the Social Security Administration advised
Splude that he was entitled to $10,659.30 as an initial SSI payment
for the period May 1991 through May 1993. After some
miscalculations were corrected by cross payment, Maine (in
accordance with Splude's agreement) received $7,582 from the Social
Security Administration for the interim assistance that Maine had
provided to Splude while he was waiting for SSI to be paid, and
Splude received the balance of $1,776.
 In June 1993, the Social Security Administration
calculated Splude's past-due SSD benefits through April 1993. 
Before any required reductions, this initial payment was computed
as $18,706.60. Other deductions aside (e.g., counsel fees), Splude
was told that $9,349.57 would be withheld from him because the SSD
payment just calculated reduced the initial SSI payment properly
due to Splude; in other words, when his initial SSI payment was
recalculated to take account of the SSD payment now due for
overlapping months, Splude had received $9349.57 too much in SSI--
which was now being recaptured for the U.S. Treasury out of his SSD
payments under the windfall offset provision.
 Splude immediately sought reconsideration. He argued,
inter alia, that the deduction from his benefits to reimburse Maine
and the deduction under the windfall offset statute were both
effectively violations of the anti-assignment provision governing
SSD. He included also constitutional claims shortly to be
described. The Social Security Administration rejected Splude's
request for reconsideration. It followed the same course in
Cargill's case in which the facts, so far as pertinent, parallel
those of Splude's case (including a repayment to Maine for interim
aid), and in which the legal claims are also similar. 
 Splude and Cargill then proceeded before an
Administrative Law Judge, and their cases were consolidated. In
January 1996, the ALJ issued a decision favoring the claimants as
regards the Maine deductions, holding that they should not have
been made. The Appeals Council reversed, reinstating the original
computations, without deciding the constitutional issues (it said
it had no authority to do so). The claimants then sought review in
the district court where the cases were assigned to a magistrate
judge for a recommended decision.
 The magistrate judge, in a decision later adopted by the
district court, ruled that the anti-assignment provision governing
SSD had not been violated. He said that the "pay whichever claim
is ready first" policy did violate equal protection principles but
that no remedial action was warranted, in part because the policy
had now changed. Accordingly, judgment was entered in favor of
the Social Security Administration. The claimants now appeal from
the district court's resolution, making us the fifth body to review
the original administrative determination.
 On appeal, we begin with the claimants' statutory
arguments, reserving the constitutional issues for later attention. 
On both levels, the issues are essentially legal, involving
interpretations of statutory and constitutional provisions or legal
characterizations of events; the raw facts are undisputed. Thus,
our review is de novo, save as the Social Security Administration's
view of the statutes may be entitled to some deference.
 The claimants in this case suffered two different
deductions pertinent here: one, nominally from their initial SSI
payments, was to reimburse Maine; the other, from their later SSD
payments, was to reimburse the U.S. Treasury for SSI overpayments
found to have occurred after SSD was calculated. The claimants'
primary attack is upon the first of these deductions--the payments
to Maine--which they say conflict with the provision barring
assignment of or levy on social security payments including SSD.
 On the surface, the claimants have no argument. The
Social Security Administration made a conventional computation of
SSI payments due, subject always to recomputation under the
windfall offset statute if latter SSD computations showed that too
much SSI had been paid. The federal agency then withheld a portion
of each claimant's initial SSI payment to reimburse Maine,
precisely as provided by the proviso to the anti-assignment statute
that approves such withholding from SSI--but not SSD--where a state
has advanced relief out of its own funds while the claimant is
awaiting federal payments.
 One is thus puzzled when, at the outset, the claimants'
brief in this court stresses the importance placed by Congress on
the anti-assignment provisions, borne out by Congress' amendment in
1983 to reinforce that prohibition, and on precedent including
Supreme Court cases protecting social security payments under the
anti-assignment provisions from assignments, liens, and other
efforts to seize the payments for a variety of otherwise just
obligations. After all, whatever the strength of the anti-
assignment provisions, a proviso explicitly permits deductions from
SSI to repay interim state assistance.
 The claimants' argument is stronger than it at first
appears. Once unraveled, the contention is not merely that the
initial payments to them would have been immune from Maine's reach
if SSD had been paid first--a correct statement but one that could
be answered by saying, "so what." The argument--put in its
strongest form--is that the original SSI payments were SSD payments
or (since the payments were calculated under the SSI statute and
were so intended to be SSI) should be recharacterized as SSD
payments. This latter is an argument that the government does not
directly answer, quite possibly because it did not fully appreciate
that it was being made. The argument rests on two pillars.
 First, one could view SSD as the unqualified "earned"
benefit, resting (at least in theory) on past contributions by or
for the claimants, and view SSI as a contingent "welfare" payment
whose amount is reduced to the extent that SSD due for the same
period pushes the claimant up against the SSI means test. This
view has some basis in the statutory framework: SSD is due
unconditionally upon disability; SSI, only to the extent that SSD
and other income fall short under the SSI means test.
 Second, one could point to Congress' strong policy to
protect the principal benefit--here, SSD--by an anti-assignment
clause not qualified (as is SSI) by an exception that allows the
state to recapture advances of relief made by the state. This
policy, it might then be argued, would be served by insisting that
the first payment made be treated as the SSD payment (up to the
full amount that would be due if SSD were calculated alone),
however the payment might be labeled by the Social Security
Administration. 
 A mathematical expression of the point is suggestive. 
Here, the government's own calculations show that if the two
initial payments due Splude for SSD and SSI had been computed at
the same time, most of what was owed would be SSD in the amount of
$18,706.60; this would be immune from withholding for Maine's
benefit (although other deductions might apply). The balance in
SSI payments due Splude, after SSD payments were imputed to his
income, would be only $1,883.30. This balance would be subject to
a deduction in Maine's favor but this would give Maine far less
than the $7,582 it originally advanced to Splude, and Splude's net
gain would be substantial.
 We decline to recharacterize the transaction. While
Congress does have a policy to protect SSD, which might be served
in some measure by the recharacterization, it also has two other
policies: to compensate states that make advances on SSI and to
recapture from SSD excessive SSI benefits previously awarded. The
recharacterization sought by Splude would result in an immediate
loss to the Treasury, contrary to the windfall offset statute, and
could in the future discourage interim state aid extended in
reliance on repayment from SSI, undercutting the aim of the proviso
to the SSI anti-assignment statute.
 We have no idea which of its several policies Congress
would regard as trumping the other if it faced and resolved the
tension, which grows out of the interplay--unanticipated by
Congress, one may suppose--of piecemeal amendments and changing
administrative practice as to the timing of payments. The sound
course for us must thus be not to engage in recharacterizations but
to treat the initial payments to claimants here as SSI, in
accordance with the intent with which they were made and the
statute under which they were actually calculated.
 A recharacterization is not required to avoid injustice. 
Splude got interim state aid, knowing that he would have to pay it
back from his SSI, which is just what happened. If SSD had been
paid first, he would largely have escaped repayment, but many would
regard this as something of a lucky accident or even a windfall. 
Similarly, Congress explicitly warned that SSD is to be reduced
where SSI is overpaid. The result here is not an injustice but
merely an anomaly. In a scheme as complex as this one, anomalies
cannot always be avoided and are not grounds for a court to rewrite
Congress' language.
 Each of the other circuits to address the issue before us
has also supported the government. See White v. Bowen, 835 F.2d
974, 978-79 (2d Cir. 1987); McKenzie v. Bowen, 787 F.2d 1216, 1220-
22 (8th Cir. 1986). Further, the Social Security Administration is
normally accorded the deference due to an agency plausibly
interpreting its own governing statutes. Cf. Chevron U.S.A. Inc.v. Natural Resources Defense Council, Inc. 467 U.S. 837, 842-45
(1984). Our own reading of the statute is thus reinforced,
although we would follow it even if other circuits and the agency
were silent.
 It is not clear whether the claimants are also attacking
the second deduction as a statutory violation. The claimants'
brief could be taken to argue elliptically that the withholding of 
a portion of the initial SSD payment due each claimant, to
reimburse the Treasury for overpaying SSI, was itself prohibited by
the anti-assignment statute protecting SSD payments from
assignment, levy and the like. The claimants refer to the 1983
amendment already mentioned that warns that "n[o] other provision
of law . . . may be construed to limit, supersede or otherwise
modify [the anti-assignment ban] except to the extent that it does
so by express reference to this section." 42 U.S.C. 407(b).
 The first deduction (from the SSI payments to repay state
advances) is unaffected by the amendment; the deduction is
permitted by a proviso within the SSI anti-assignment provision
itself. However, the second deduction (from the SSD payments to
recapture SSI overpayments) is premised on another law, the
windfall offset provision, which itself makes no reference to the
anti-assignment provision. Should we then regard the second
deduction as one constituting an assignment, levy, or the like of
SSD funds which is authorized but inadequately so because not by a
statute that makes "express reference to" the anti-assignment
statute? 
 The most straightforward reading of the windfall offset
provision is that what it effects is not any kind of assignment or
levy but an internal computation of how much SSD or SSI is due--a
computation by which a prior overpayment in either category for the
same period is used to reduce what is to be paid in the other
category. Further, the windfall offset provision is a specific
directive to withhold from SSD an amount needed to recapture excess
SSI previously paid; it is hard to think that Congress, in adopting
the broad "express reference" amendment to the anti-assignment
statute, meant sub silentio to repeal its own prior specific
directive. Accordingly, we conclude that the second deduction,
from SSD itself, violates no statute.
 This brings us to claimants' constitutional claims. The
first argument, explicitly summarized in the heading of their
brief, is that the "backdoor" assignment of their SSD benefits
"without notice and an opportunity to be heard" violated the
claimants' rights to due process of law under the Fifth Amendment. 
Claimants rely heavily, in this connection, on Dionne v. Bouley,
757 F.2d 1344 (1st Cir. 1985). 
 Cast as a claim that procedural rights were wrongly
denied, the argument makes no sense. Both deductions--from SSI for
Maine and from SSD for the Treasury--were computations made in the
course of determining what the Social Security Administration
should remit to the claimants. The government was hardly obliged
to pay out moneys before initially determining what was due. 
Thereafter, plaintiffs point to nothing procedurally inadequate
about the process afforded to them to show that they were entitled
to more than the government paid them.
 The objections claimants raise to the deductions are
substantive (i.e., they do not like the result), but that is not a
problem of notice or opportunity to object. Dionne is wholly
distinguishable. In that case, a judgment creditor secured an
attachment on the debtor's bank account, primarily containing
social security payments exempt from attachment. This court agreed
with the debtor that Rhode Island procedure was deficient in
failing to provide the debtor, post-attachment, with notice and a
prompt opportunity to remove the attachment based upon the federal
anti-attachment provision governing Social Security payments.
 So far as the claimants are making an argument based on
substantive due process or takings law, as some of their other
citations suggest, the answer is a different one. Social security
benefits like SSD have been regarded in some contexts as "property"
for constitutional purposes. See, e.g., Mathews v. Eldridge, 424
U.S. 319 (1976) (continued receipt of social security disability
checks). But this case requires no exploration of the
circumstances in which such a property interest can be limited or
qualified.
 Here, the deduction from SSI for the benefit of Maine,
agreed to by the claimants, was part of a transaction that
effectively advanced a portion of their SSI welfare benefits; the
claimants got the full amount due, some of it paid earlier for
their own benefit. Conversely, the reduction of SSD to account for
an overpayment of SSI, effected under the windfall offset statute,
recaptures for the government SSI payments to which the claimant
was never entitled. In neither case did the deduction comprise a
taking or other wrongful interference with a property interest.
 The final argument made by the claimants is that the
then-practice of the Social Security Administration of paying first
whichever benefit was first calculated violates equal protection
principles. As noted above, one who gets paid SSD first may end up
effectively avoiding repayment of some or all of a state advance;
one who gets paid SSI first may end up repaying all of the
advances. The claimants say that the (now-superseded) payment
policy was irrational discrimination because it created two classes
of similarly situated persons who receive different benefits based
on the accident of which payment occurred first.
 The federal government is not directly governed by the
equal protection clause, which appears only in the Fourteenth
Amendment, but the Supreme Court has held that equal protection
principles are implicit in the Fifth Amendment's due process
clause. See Bolling v. Sharpe, 347 U.S. 497 (1954). The
magistrate judge agreed with the claimants that the former payment
policy did violate equal protection principles. He then withheld
relief on grounds that we need not describe, because we find no
such violation.
 In reaching this conclusion, we reject at the outset the
government's contention that claimants' equal protection claim
fails merely because there is no charge of "purposeful
discrimination" by the Social Security Administration, that is to
say, a subjective intent to favor one group or disfavor another on
impermissible grounds. In certain kinds of cases--e.g., those
involving ad hoc actions or those involving merely an adverse
impact on an individual group--lack of such an invidious purpose
may be fatal to the claim. See, e.g., Washington v. Davis, 426
U.S. 229 (1976).
 However, any "classification" by the government, even if
made without any wrongful or suspect purpose, is required under
equal protection principles to meet a minimum requirement of
rationality. See Schweiker v. Wilson, 450 U.S. 221, 230 (1981);
Baker v. City of Concord, 916 F.2d 744, 747 (1st Cir. 1990). The
former practice of the Social Security Administration to pay
whichever claim was computed first might be regarded as creating a
classification since it was a deliberate, ongoing policy that did
predictably, although innocently, create two groups of claimants
enjoying different net benefits. The difficulty for Splude and
Cargill is that the test of rationality is extremely generous to
the government in social and economic matters, see Baker, 916 F.2d
at 747, and a policy that seeks to get payments out as soon as they
are ready is not irrational. Delaying payments until both SSI and
SSD are computed doubtless threatens hardships of its own. That a
particular classification scheme, otherwise rational, will produce
occasional aberrant outcomes is something that the Constitution is
taken to tolerate.
 Affirmed. STATUTORY APPENDIX
42 U.S.C. 407. Assignment; amendment of section
 (a) The right of any person to any future
 payment under this subchapter shall not be
 transferable or assignable, at law or in
 equity, and none of the moneys paid or payable
 or rights existing under this subchapter shall
 be subject to execution, levy, attachment,
 garnishment, or other legal process, or to the
 operation of any bankruptcy or insolvency law.

 (b) No other provision of law, enacted before,
 on, or after April 20, 1983, may be construed
 to limit, supersede, or otherwise modify the
 provisions of this section except to the
 extent that it does so by express reference to
 this section.

42 U.S.C. 1320a-6. Adjustments in SSI benefits on account of
retroactive benefits under subchapter II

(a) Reduction in benefits

Notwithstanding any other provision of this chapter, in any case
where an individual--

 (1) is entitled to benefits under subchapter
 II of this chapter that were not paid in the
 months in which they were regularly due; and

 (2) is an individual or eligible spouse
 eligible for supplemental security income
 benefits for one or more months in which the
 benefits referred to in clause (1) were
 regularly due,

 then any benefits under subchapter II of this
 chapter that were regularly due in such month
 or months, or supplemental security income
 benefits for such month or months, which are
 due but have not been paid to such individual
 or eligible spouse shall be reduced by an
 amount equal to so much of the supplemental
 security income benefits, whether or not paid
 retroactively, as would not have been paid or
 would not be paid with respect to such
 individual or spouse if he had received such
 benefits under subchapter II of this chapter
 in the month or months in which they were
 regularly due. A benefit under subchapter II
 of this chapter shall not be reduced pursuant
 to the preceding sentence to the extent that
 any amount of such benefit would not otherwise
 be available for payment in full of the
 maximum fee which may be recovered from such
 benefit by an attorney pursuant to section
 subsection (a)(4) or (b) of section 406 of
 this title.

(b) "Supplemental security income benefits" defined

 For purposes of this section, the term
 "supplemental security income benefits" means
 benefits paid or payable by the Commissioner
 of Social Security under subchapter XVI of
 this chapter, including State supplementary
 payments under an agreement pursuant to
 section 1382e(a) of this title or an
 administration agreement under section 212(b)
 of Public Law 93-66.

(c) Reimbursement of the State

 From the amount of the reduction made under
 subsection (a) of this section, the
 Commissioner of Social Security shall
 reimburse the State on behalf of which
 supplementary payments were made for the
 amount (if any) by which such State's
 expenditures on account of such supplementary
 payments for the month or months involved
 exceeded the expenditures which the State
 would have made (for such month or months) if
 the individual had received the benefits under
 subchapter II of this chapter at the times
 they were regularly due. An amount equal to
 the portion of such reduction remaining after
 reimbursement of the State under the preceding
 sentence shall be covered into the general
 fund of the Treasury.

42 U.S.C. 1383(d). Procedures applicable; prohibition on
assignment of payments; representation of claimants

 (1) The provisions of section 407 of this
 title and subsections (a), (d), and (e) of
 section 405 of this title shall apply with
 respect to this part to the same extent as
 they apply in the case of subchapter II of
 this chapter.

42 U.S.C. 1383(g). Reimbursement to States for interim
assistance payments

 (1) Notwithstanding subsection (d)(1) of this
 section and subsection (b) of this section as
 it relates to the payment of less than the
 correct amount of benefits, the Commissioner
 of Social Security may, upon written
 authorization by an individual, withhold
 benefits due with respect to that individual
 and may pay to a State (or a political
 subdivision thereof if agreed to by the
 Commissioner of Social Security and the State)
 from the benefits withheld an amount
 sufficient to reimburse the State (or
 political subdivision) for interim assistance
 furnished on behalf of the individual by the
 State (or political subdivision).